999 F.2d 541
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Scott Ray HURST, Defendant-Appellant.
 No. 92-6316.
 United States Court of Appeals, Sixth Circuit.
 July 21, 1993.
 
 Before: MERRITT, Chief Judge; and JONES and NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-Appellant Scott Ray Hurst appeals his sentence imposed following a guilty plea. In addition to raising several issues pertaining to the federal sentencing guidelines, he suggests that he should be permitted to withdraw his guilty plea or withdraw from his Plea Agreement with the government because the government did not hold up its end of the Plea Agreement when it argued against his receiving a reduction of his offense level under the federal sentencing guidelines for acceptance of responsibility. We find no merit in Hurst's contentions and thus affirm.
 
 
 2
 * and
 
 
 3
 On April 23, 1992, as U.S. National Park Service Ranger Huseman was driving in the Great Smoky Mountains National Park, she was passed by a silver Ford pickup truck and a maroon and yellow Dodge van. As Ranger Huseman passed the Sinks area of the park, she observed that the van had hit a large rock at the entrance to a parking lot. She contacted U.S. National Park Service Ranger Ivey and reported the accident.
 
 
 4
 Upon arriving at the scene of the accident, Ranger Huseman and Ranger Ivey noticed that the van had been moved into the parking lot, where the pickup truck was parked. While Ranger Huseman was checking on the seventeen-year-old driver of the van, Hurst got out of the pickup truck and walked over to see what was happening.
 
 
 5
 When asked for his license, the boy responded that he did not have one. Ranger Ivey ran a check on the van. The inquiry revealed that the van was possibly stolen. Ranger Ivey then tried to take the boy into custody, but the boy ran away into the park.
 
 
 6
 Hurst retreated to the pickup truck. Ranger Huseman followed him and asked him if he was the boy's buddy. Looking inside the pickup truck, Ranger Huseman noticed that the ignition portion of the steering column had apparently been tampered with. Hurst was asked if he had any weapons and responded that he only had a hunting knife. He was asked to remain in the pickup truck while Ranger Huseman ran a check on it, but did not oblige. Stating that he was going to get his friend, he fled on foot into the woods in the direction the boy had fled.
 
 
 7
 Using bloodhounds and a helicopter, the boy was finally apprehended after a five-hour hunt. Hurst was taken into custody after an eight-hour search.
 
 
 8
 After his arrest, Hurst gave a statement to U.S. National Park Service Ranger Acree. Hurst related that the pickup truck had been taken from some apartments near Martin Mill Pike, Knoxville, Tennessee. A friend told him where the pickup truck was, that it was stolen, and how to start it. After Hurst was taken to the pickup truck by some friends, he and another individual started the truck with the assistance of Hurst's hunting knife. Hurst then drove around with the seventeen-year-old boy until they spotted the van. Hurst parked the pickup truck next to the van and waited approximately five minutes until the boy successfully started it. Hurst and the boy then drove the stolen vehicles in tandem into the national park where the accident occurred.
 
 B
 
 9
 On April 29, 1992, a one-count Indictment was filed in the United States District Court for the Eastern District of Tennessee, charging Hurst with receiving and concealing an automobile which had been feloniously taken and stolen, knowing the same to have been so taken and stolen, within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 662 (1988). Hurst pled not guilty at his arraignment on May 1, 1992. He was released into the custody of his mother on $5000 bond, with several conditions, such as: (1) that he participate in an electronic monitoring program; (2) that he not commit any federal, state or local crime while on release; (3) that he maintain or actively seek employment; (4) that he report to the pretrial services agency as directed by that agency; (5) that he refrain from excessive use of alcohol and from any use or unlawful possession of narcotic drugs and other controlled substances unless prescribed by a licensed medical practitioner; and (6) that he submit to drug screening tests as directed by the pretrial services agency.
 
 
 10
 On June 22, 1992, Hurst changed his plea to guilty. A Plea Agreement was filed with the district court on that date which contained the following relevant provisions:
 
 
 11
 1. The defendant will enter a voluntary plea of guilty to [the] Indictment....
 
 
 12
 ....
 
 
 13
 6. The Government agrees not to oppose a finding by the Court of the defendant's acceptance of responsibility for this crime, in the event the defendant pleads guilty pursuant to this Plea Agreement.
 
 
 14
 J.A. at 15-16.
 
 
 15
 On July 1, 1992, the conditions of Hurst's presentencing release were modified such that he was no longer required to be electronically monitored.
 
 
 16
 On August 24, 1992, the government filed a motion to revoke Hurst's bond. The government alleged that Hurst violated the terms of his release by: (1) testing positive for marijuana on July 10, 1992, and on August 3, 1992; (2) failing to report to follow-up drug testing on August 10, 1992, and August 17, 1992, as instructed; and (3) being arrested and charged with theft by state authorities on August 14, 1992, for cashing a paycheck twice. Bond was revoked on September 4, 1992, and Hurst was detained pending sentencing.
 
 
 17
 A presentence report was prepared. Hurst filed objections to it on September 10, 1992. He objected, inter alia, to the facts that: (1) the entire value of the pickup truck ($12,000) was taken to be the value of the "loss" for purposes of Section 2B1.1 of the United States Sentencing Commission's Guidelines Manual (Nov. 1991) [hereinafter U.S.S.G.], as opposed to merely the $1331.61 worth of post-theft damage to the pickup truck and consequential damages incurred by the owner of the pickup truck; (2) the theft of the van was included as relevant conduct for sentencing purposes under U.S.S.G. § 1B1.3; and (3) he was denied a two-level downward adjustment of his offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility.
 
 
 18
 Hurst was provided a sentencing hearing on September 23, 1992. At the hearing, the Assistant U.S. Attorney was asked to comment on Hurst's acceptance of responsibility. He responded:
 
 
 19
 In the case of the Court's determination of whether acceptance of responsibility is proper, under section 3E1.1 of the guidelines, the guilty plea is merely one factor. There are other factors. I wanted to talk a moment about three of them. We have discussed one of the factors the Court may also look at in addition to a plea of guilty is whether or not the defendant voluntarily terminated and withdrew from criminal conduct. Of course, we have already talked about his conduct since he was released.
 
 
 20
 We feel that those facts fall into that category as a basis for this Court to find that the defendant did not voluntarily terminate his criminal conduct. Another factor to be looked at is whether the defendant voluntarily paid restitution prior to the adjudication of guilt. In this case we have the owner of the truck that the defendant stole is in the courtroom. He had to incur some out-of-pocket loss just to recover his truck. That is all in the [presentence report]. That has not been repaid yet.
 
 
 21
 There is another basis for the Court to find there's no acceptance of responsibility. A third factor in the guidelines is whether the defendant voluntarily surrendered to authorities promptly after commission of the offense. In this case there was approximately an eight hour manhunt in the park because both the defendant and the juvenile took out into the woods and hid in the Smoky mountains so that they could not be found. It took a lot of not only manpower from the park, but helicopters called in from the County Sheriff's Department and other law enforcement units called in to assist in this effort.
 
 
 22
 J.A. at 64-65.
 
 
 23
 In the end, the district court rejected the three aforementioned objections to the presentence report and sentenced Hurst to sixteen months of imprisonment, to be followed by one year of supervised release. Judgment was entered on September 25, 1992. Hurst appealed on October 2, 1992.
 
 II
 
 24
 and
 
 
 25
 Hurst pled guilty to a violation of 18 U.S.C. § 662. According to U.S.S.G. Appendix A, the sentencing court is to apply U.S.S.G. § 2B1.2 to such an offense. Section 2B1.2 reads, in pertinent part:
 
 
 26
 § 2B1.2. Receiving, Transporting, Transferring, Transmitting, or Possessing Stolen Property
 
 
 27
 (a) Base Offense Level: 4
 
 
 28
 (b) Specific Offense Characteristics
 
 
 29
 (1) If the value of the stolen property exceeded $100, increase by the corresponding number of levels from the table in § 2B1.1.
 
 
 30
 Section 2B1.1, in turn, ties levels of loss to increases in offense level:
 
 
 31
 (b) Specific Offense Characteristics
 
 
 32
 (1) If the loss exceeded $100, increase the offense level as follows:
 
 
 33
 Loss (Apply the Greatest) Increase in Level
 
 
 34
 (A) $100 or less no increase
(B) More than $100 add 1
(C) More than $1,000 add 2
(D) More than $2,000 add 3
(E) More than $5,000 add 4
(F) More than $10,000 add 5
(G) More than $20,000 add 6
 
 
 35
 Application Note Two to this provision is relevant to the instant appeal, and reads:
 
 
 36
 "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim. When property is damaged, the loss is the cost of repairs, not to exceed the loss had the property been destroyed. Examples: (1) In the case of a theft of a check or money order, the loss is the loss that would have occurred if the check or money order had been cashed. (2) In the case of a defendant apprehended taking a vehicle, the loss is the value of the vehicle even if the vehicle is recovered immediately.
 
 
 37
 The presentence report, noting that the value of the pickup truck was approximately $12,000, added five levels pursuant to U.S.S.G. §§ 2B1.2(b)(1) and 2B1.1(b)(1)(F) to the base offense level of four established by U.S.S.G. § 2B1.2(a).
 
 
 38
 Hurst objected to this, stating that "the loss upon which the offense level is based should be the actual damage to the vehicle, not the entire value of the stolen property.... Although those figures are not included in the Presentence Investigation, it is the cost of repairs that should determine the offense level as a specific offense characteristic." J.A. at 44-45. The district court rejected Hurst's argument. Hurst renews it on appeal. Since the argument essentially takes issue with the district court's interpretation of the guidelines, our review is de novo. See, e.g., United States v. Beckner, 983 F.2d 1380, 1383 (6th Cir.1993) ("Guideline interpretation is a question of law to be reviewed by this Court de novo.").
 
 
 39
 We conclude that Hurst's argument on this score is without merit. Section 2B1.2(b)(1) attempts to gauge the severity of the crime committed by examining the "value of the stolen property." The table in Section 2B1.1(b)(1) provides the specific means by which to gauge the severity of the offense. The commentary to Section 2B1.1 makes it clear that, when property is taken, the "loss" for federal sentencing guidelines purposes is the fair market value of the property at issue. U.S.S.G. § 2B1.1, comment. (n. 2). An example given in this commentary has analogous application to this case: "In the case of a defendant apprehended taking a vehicle, the loss is the value of the vehicle even if the vehicle is recovered immediately." Id. Given this structure, we conclude that, when an individual is charged with receiving/concealing feloniously stolen property, knowing the same to be so stolen, within the special maritime and territorial jurisdiction of the United States, the "loss" under Section 2B1.1(b)(1) is the value of the property taken.
 
 
 40
 At the sentencing hearing and on appeal, Hurst has relied solely on United States v. Sloman, 909 F.2d 176, 181-82 (6th Cir.1990), as case support for his stance. In Sloman, an individual insured a new boat for its full value of $140,000. About a month after its purchase, the boat was damaged by fire. After the boat owner filed an insurance claim, the insurance company assigned an adjuster to the case. This adjuster convinced the insurance company that, since he did not have enough experience appraising boats, the company should hire an independent adjuster. This independent adjuster advised the insurance company that the boat was a constructive total loss. On the basis of this report, the insurance company settled the claim for $140,000. The independent adjuster then submitted two fabricated salvage bids and the boat was sold by the insurance company to the highest salvage bidder for $34,001. The salvage price was paid by the independent adjuster.
 
 
 41
 In actuality, the boat was not that severely damaged. It was estimated that the boat could have been repaired for $6500. After such repairs, the boat's value would have been estimated at $120,000 to $130,000.
 
 
 42
 Of relevance to the instant case, in Hurst's view, is the Sixth Circuit's statements relating to what constituted a "loss" for federal sentencing guidelines purposes. Without much discussion, the court in Sloman affirmed the district court's determination that the "loss" to the insurance company was equal to ($140,000-$34,001) or $105,999. This figure represented not the total value of the boat but the insurance company's net out-of-pocket loss. From this, Hurst argues that the "loss" in the case at bar should be the net out-of-pocket loss to the owner of the pickup truck, not the total value of the pickup truck.
 
 
 43
 Hurst's argument is misplaced. If an individual attempts to cash a forged check, for example, that individual would be engaging in a fraudulent scheme to deprive someone of the amount of the check. For federal sentencing guidelines purposes, the extent of the scheme to defraud is the measure of the value of the "loss." See U.S.S.G. § 2F1.1, comment. (n. 7). In Sloman, the scheme to defraud the insurance company involved both the submission of a false damage report and a subsequent salvage sale. The extent of the scheme to defraud was taken to be the difference between what the independent adjuster fraudulently induced the insurance company to settle the claim for and the salvage price paid by the independent adjuster to the insurance company. What constitutes "loss" will vary with the nature of the offense. In a fraud case (such as Sloman ), the extent of the "loss" might be determined by how much money an individual attempts to deprive another of by fraudulent means. In a theft case or a receipt-of-stolen-property case, the federal sentencing guidelines dictate that the extent of the "loss" is properly understood as the value of the stolen property.
 
 B
 
 44
 Given our disposition of Hurst's Section 2B1.1 argument, we find his Section 1B1.3 argument to be of no consequence. The presentence report noted:
 
 
 45
 35. Since defendant Hurst aided and abetted the juvenile in stealing the van, 1B1.3(c)(3) of the Guidelines, relevant conduct, is applicable. The stolen van, however, was valued between $5,000 and $5,925. Therefore, the total of both vehicles is still more than $10,000, but less than $20,000, making the base level 9.
 
 
 46
 J.A. at 41 (emphasis added). Given that the entire value of the pickup truck ($12,000) was properly used to gauge the severity of Hurst's offense as discussed above, whether or not we determine the district court to have erred in including the value of the stolen van as "loss" would have absolutely no impact on Hurst's sentence. See United States v. Thomas, 973 F.2d 1152, 1159 (5th Cir.1992) ("[T]he government contends that even if the district court erred in estimating loss, defendant suffered no harm. We agree, and find a remand unwarranted."); United States v. Jones, No. 91-5836 (6th Cir. Aug. 18, 1992) (unpublished order) ("[E]ven if the district court had not included the disputed 8.4 grams of crack in the drug quantity attributed to [defendant], there would have been no difference in his sentencing range. The issue is, therefore, moot."), cert. denied, 113 S.Ct. 1018 (1993); cf. United States v. Ford, No. 92-1066 (6th Cir. Feb. 24, 1993) (unpublished opinion), cert. denied, 61 U.S.L.W. 3835 (U.S. June 14, 1993) (No. 92-8666). Given this, and in the absence of collateral consequences of the district court's finding on this score, we proceed directly to the next issue.
 
 C
 
 47
 Hurst's argument concerning the acceptance of responsibility adjustment may be broken down into two basic arguments. The first argument is that the district court clearly erred as a matter of fact by not awarding Hurst an acceptance of responsibility reduction. The second argument is that Hurst should be permitted to withdraw his guilty plea or withdraw from the Plea Agreement based on the government's statements in opposition to the reduction at the sentencing hearing.[1]
 
 
 48
 * Hurst contends that the district court erred by not granting him a two-level reduction for "clearly demonstrat[ing] a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a). The standard of review for a denial of an acceptance of responsibility reduction is discussed in Application Note Five to Section 3E1.1:
 
 
 49
 The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.
 
 
 50
 See United States v. Wilson, 878 F.2d 921, 923 (6th Cir.1989). Insofar as the determination of whether a defendant has accepted responsibility is a question of fact, it enjoys the protection of the clearly erroneous standard of review. See United States v. Lassiter, 929 F.2d 267, 270 (6th Cir.1991).
 
 
 51
 The defendant has the burden of proving, by a preponderance of the evidence, that s/he is entitled to the two-level downward adjustment for acceptance of responsibility. United States v. Williams, 940 F.2d 176, 181 (6th Cir.) ("the defendant bears the burden of showing by a preponderance of the evidence that he or she has accepted responsibility for the crime committed"), cert. denied, 112 S.Ct. 666 (1991); see also United States v. Rodriguez, 896 F.2d 1031, 1032 (6th Cir.1990) ("we now hold that when a defendant seeks to establish facts which would lead to a sentence reduction under the Guidelines, he shoulders the burden of proving those facts by a preponderance of the evidence").
 
 
 52
 Hurst claims that he is entitled to the acceptance of responsibility reduction because he pled guilty, agreed to pay restitution, gave a detailed statement of his role in the offense, vocalized remorse at the sentencing hearing for what he had done, asked the court for assistance in overcoming his problems with marijuana and alcohol, and expressed an interest in taking some college credit courses while incarcerated "in an attempt to set his life upon a better path." Hurst's Br. at 18.
 
 
 53
 The district court's factual finding that Hurst did not accept responsibility is not clearly erroneous. Though Hurst eventually pled guilty, "[a] guilty plea does not automatically entitle a defendant to the acceptance of responsibility reduction." United States v. Carroll, 893 F.2d 1502, 1512 (6th Cir.1990); see also United States v. Guarin, 898 F.2d 1120, 1121-22 (6th Cir.1990). The court considered the fact that Hurst continued to engage in theft-related criminal activity after pleading guilty to a theft-related crime. The court also considered the fact that Hurst failed to report to a probation officer as required by the terms of his presentencing release, and "ran off for two weeks and didn't tell anybody where [he was and] didn't tell the probation officer [and t]he police had to go out and find [him] and arrest [him]." J.A. at 62.[2] From his actions, it seems clear that Hurst, figuratively speaking, had to be dragged kicking and screaming into a court of law to answer for his crime. In sum, we conclude that the district court did not clearly err, as a factual matter, in finding that Hurst did not accept responsibility. There was ample evidence, properly considered, that he did not accept responsibility for his criminal activity.
 
 2
 
 54
 Hurst suggests that the government breached the Plea Agreement when, at the sentencing hearing, it made an argument in opposition to his receiving an acceptance of responsibility reduction. He indicates that, as a result of such breach, he should be permitted to withdraw his plea or withdraw from the Plea Agreement.
 
 
 55
 As noted above, the Plea Agreement states: "The Government agrees not to oppose a finding by the Court of the defendant's acceptance of responsibility for this crime, in the event the defendant pleads guilty pursuant to this Plea Agreement." J.A. at 16. The record indicates that, at the time the government made its comments at the sentencing hearing, the district court had not made any "finding" or even tentative finding that Hurst had accepted responsibility. There being no finding to oppose, there was no breach of the Plea Agreement of the sort Hurst alleges.
 
 
 56
 AFFIRMED.
 
 
 
 [1]
 Hurst raises a third argument in his Reply Brief, namely, that the district court erred as a matter of law by considering inappropriate factors in assessing whether he accepted responsibility. Citing United States v. Morrison, 983 F.2d 730 (6th Cir.1993), he contends that his actions while released on bond should not be considered because they are not of the same type as the underlying offense and are not otherwise strongly linked to the underlying offense. See id. at 735. The issue he presents, namely, whether clear violations of conditions of release pending sentencing are, by their nature, "strongly linked" to the underlying offense was not squarely addressed in Morrison. Given that this issue was raised in his Reply Brief and that oral argument was waived, there are strong policy considerations against our addressing the issue in this opinion. See Wright v. Holbrook, 794 F.2d 1152, 1156-57 (6th Cir.1986) ("Plaintiff's argument on this issue was raised for the first time in his reply brief. Accordingly, it will not be considered on appeal. The reason for this rule is clear: 'It is impermissible to mention an issue for the first time in a reply brief, because the appellee then has no opportunity to respond.' ... [T]he issue presented in plaintiff's reply brief is far from clear. Since defendant was deprived of an opportunity to address the issue by plaintiff's failure to raise this issue in his original brief, we will consider the issue waived.") (citations omitted); United States v. Jenkins, 904 F.2d 549, 554 n. 3 (10th Cir.) ("[R]aising the issue only in the Reply Brief affords the government no opportunity to address it. Given the complexity of the question, we decline to consider it without adequate briefing from both sides."), cert. denied, 498 U.S. 962 (1990); see also United States v. Jerkins, 871 F.2d 598, 602 n. 3 (6th Cir.1989); United States v. Hoster, 988 F.2d 1374, 1383 (5th Cir.1993); United States v. Jackson, 983 F.2d 757, 770 n. 6 (7th Cir.1993); United States v. Nueva, 979 F.2d 880, 885 n. 8 (1st Cir.1992), cert. denied, 113 S.Ct. 1615 (1993); United States v. Chippas, 942 F.2d 498, 500 (8th Cir.1991); United States v. Campo, 793 F.2d 1251, 1252 (11th Cir.) (per curiam), cert. denied, 479 U.S. 938 (1986)
 Moreover, we find that we need not address the merits of Hurst's Morrison argument because, based on our review of the record as a whole, we conclude that any error would be harmless error, i.e., would "not [have] affect[ed] the district court's selection of the sentence imposed." Williams v. United States, 112 S.Ct. 1112, 1121 (1992). As discussed forthwith, there was ample evidence, properly considered, in support of the district court's decision to deny the acceptance of responsibility reduction.
 
 
 [2]
 As an aside, we observe that the government noted at the sentencing hearing that it took eight hours to track Hurst down after he ran from the park rangers. This hardly demonstrates "voluntary surrender to authorities promptly after commission of the offense," U.S.S.G. § 3E1.1, comment. (n. 1(d)), which may be considered in evaluating a request for an acceptance of responsibility reduction